IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | 8:19CR248 |
| v. | |
| OMERO LEON, | MEMORANDUM AND ORDER |
| Defendant. | |

This matter is before the Court on defendant Omero Leon's ("Leon") Motion to Suppress Statements (Filing No. 13) he made to law enforcement on August 18, 2018, and July 24, 2019, and the magistrate judge's Findings and Recommendation (Filing No. 31) that Leon's motion be granted. The government concedes Leon's first statements—made in response to custodial interrogation without the benefit of the warnings required by *Miranda v. Arizona*, 384 U.S. 436 (1966)—are inadmissible. But the government objects (Filing No. 35) to the recommended exclusion of Leon's later statements. For the reasons stated below, Leon's motion is granted in part and denied in part.

**I.     BACKGROUND**

On August 18, 2018, Leon was arrested after his girlfriend, R.S., a Native American woman, reported to police that he hit her in the arm with a frying pan. Soon after the arrest, Leon made inculpatory statements in response to questions from Thurston County Sheriff Deputy Derek Utemark ("Deputy Utemark"). Deputy Utemark did not advise Leon of his *Miranda* rights before questioning him. Leon reportedly spent one day in jail.

Almost a year later, Special Agents Stephen Friend ("Special Agent Friend") and Sam Roberts ("Special Agent Roberts" and collectively, "agents") of the Federal Bureau of Investigation ("FBI") contacted Leon about the allegations. Having reviewed the existing police reports and body-camera footage of Deputy Utemark's questioning, Special

Agent Friend understood Leon's custodial statements were at least "problematic" and likely inadmissible.

On July 24, 2019, the agents arrived unannounced at Leon's residence in Macy, Nebraska, to interview him about the August 18, 2018, incident. They were dressed in plain clothes with their badges visible. Both carried firearms. Special Agent Friend carried a pistol holstered visibly on his left hip. Special Agent Roberts carried concealed on his right hip. Neither touched nor unholstered their firearms during the encounter with Leon.

When the agents arrived at Leon's house, Special Agent Friend, who was familiar with Leon from a prior incident, knocked on the door and identified himself and Special Agent Roberts as FBI agents. He told Leon they needed to speak with him about the incident with R.S. Leon willingly agreed to talk to them and stepped outside. Satisfied that Leon was not in custody and that the conversation was voluntary, the agents did not give any *Miranda* warnings or tell Leon he could end the interview and go back inside.

After stepping outside, Leon—apparently not entirely clear about why the agents were there—began to discuss another incident from May 2018,[1] before the agents clarified they wanted to discuss the August 18, 2018, incident. Leon then explained he was washing a frying pan in the kitchen sink during a verbal altercation with R.S. Leon stated he turned around and threw the pan at R.S., striking her in the arm. Special Agent Roberts gave Leon a padfolio and asked him to demonstrate what he did with the pan. Leon complied.

At the end of the interview, the agents thanked Leon and told him they would contact him if they needed anything further. The officers did not place him under arrest. He went back into his house and the agents left. In all, Leon spoke with the agents in his front yard for five to ten minutes. The tone was conversational, and no one raised their voices. Leon

---

[1] At a suppression hearing on January 16, 2020, Leon's counsel said the prior incident occurred in May 2018. In his supplemental brief, Leon asks the Court to take notice of an incident from March 15, 2018. The actual date makes no difference.

was never handcuffed or restrained in any way. He remained free to move throughout the interview. According to Special Agent Friend, Leon could have walked away or returned to his residence at any time.

A day or two after the interview, Special Agent Friend swore out an affidavit that eventually led to federal charges. On August 19, 2019, the government filed an Information (Filing No. 1) charging Leon with assaulting R.S. on August 18, 2018, in violation of 18 U.S.C. §§ 113(a)(4) and 1152.

On September 30, 2019, Leon moved (Filing No. 13) to suppress his statements to Deputy Utemark on August 18, 2018, and to the agents on July 24, 2019, arguing they had all been taken in violation of his *Miranda* rights. The government opposed (Filing No. 16) the motion. At the magistrate judge's request, the parties filed supplemental briefs (Filing Nos. 21 and 22) regarding any relevance the decision in *Missouri v. Seibert*, 542 U.S. 600 (2004), might have to the suppression issues in this case.

At the January 16, 2020, suppression hearing, Special Agent Friend was the only witness. Neither party offered any other evidence. On February 18, 2020, the magistrate judge issued a Findings and Recommendation recommending the Court grant Leon's motion in full. Noting the government did not intend to offer Leon's statements to Deputy Utemark on August 18, 2018, the magistrate judge found Leon "was in custody on July 24, 2019, and that the failure to provide him with *Miranda* warnings prior to questioning render[ed] his statements inadmissible." The magistrate judge alternatively concluded that "even if [Leon] was not in custody during the July 24, 2019, *Miranda*-less questioning, the undersigned magistrate judge nevertheless finds that [Leon's] statements must be suppressed as tainted by the prior *Miranda* violation in August 2018."

On March 17, 2020, the government timely objected (Filing No. 35) to the Findings and Recommendation. Although the government raises six specific objections, they boil down to an elemental challenge to the magistrate judge's ultimate conclusions that (1) Leon

3

was in custody when interviewed on July 24, 2019, and (2) his statements that day were tainted by the August 2018 *Miranda* violation. Leon did not file a response.

## II. DISCUSSION

### A. Standard of Review

Title 28, section 636(b)(1)(B) authorizes the Court to "designate a magistrate judge to conduct" an evidentiary hearing and submit "proposed findings of fact and recommendations for the disposition" of a motion to suppress evidence in a criminal case. When a party timely objects to the magistrate judge's findings and recommendation, as the government did here, the Court must "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made" and "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *Id.* § 636(b)(1); *accord* Fed. R. Crim. P. 59(b)(3).

### B. The Custody Inquiry

The Fifth Amendment prohibits compelling a criminal defendant "to be a witness against himself." U.S. Const. amend. V. "To safeguard the uncounseled individual's Fifth Amendment privilege against self-incrimination, the *Miranda* Court held, suspects interrogated while in police custody must be told that they have a right to remain silent, that anything they say may be used against them in court, and that they are entitled to the presence of an attorney, either retained or appointed, at the interrogation." *Thompson v. Keohane*, 516 U.S. 99, 107 (1995) (citing *Miranda*, 384 U.S. at 444).

But "[n]ot every confession obtained absent the *Miranda* warnings is inadmissible." *United States v. LeBrun*, 363 F.3d 715, 720 (8th Cir. 2004) (en banc). "*Miranda* warnings are due only when a suspect interrogated by the police is 'in custody.'" *Thompson*, 516 U.S. at 102.

That brings us to the first issue before the Court. Leon says he was in custody when he was interviewed on July 24, 2019. The government says he was not.

Whether Leon was "'in custody' is an objective inquiry." *J.D.B. v. North Carolina*, 564 U.S. 261, 270 (2011). It "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 323 (1994) (per curiam).

To determine whether Leon was in custody on July 24, 2019, the Court must consider "whether, given the totality of the circumstances, a reasonable person would have felt at liberty to terminate the interrogation and leave or cause the agents to leave." *United States v. Vinton*, 631 F.3d 476, 481 (8th Cir. 2011). The Eighth Circuit has identified a non-exhaustive list of factors that courts *can* consider in deciding whether a suspect is in custody, including the following:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; [and] (6) whether the suspect was placed under arrest at the termination of the questioning.

*United States v. Hoeffener*, 950 F.3d 1037, 1045-46 (8th Cir. 2020) (quoting *United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990)). Other relevant factors may include the time, place, and length of the interview and the suspect's age, education, intelligence, work history, and prior experience with law enforcement. *See*, *e.g.*, *United States v. Laurita*, 821 F.3d 1020, 1026 (8th Cir. 2016); *LeBrun*, 363 F.3d at 723.

But evaluating custody is not a simple tallying exercise. *See United States v. Ollie*, 442 F.3d 1135, 1140 (8th Cir. 2006); *United States v. Czichray*, 378 F.3d 822, 827 (8th Cir. 2004) ("'[C]ustody' cannot be resolved merely by counting up the number of factors on each side of the balance and rendering a decision accordingly."). "In the end, these

criteria are only useful tools meant to focus attention." *Ollie*, 442 F.3d at 1140. "The ultimate question in determining whether a person is in 'custody' for purposes of *Miranda* is 'whether there is a formal arrest or restraint on freedom of movement of the degree associated with formal arrest.'" *Czichray*, 378 F.3d at 826 (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam)).

Applying these principles to the totality of the circumstances of Leon's interview on July 24, 2019, the Court finds he was not in custody when he made the statements at issue. Leon was neither formally arrested nor faced restraints on his freedom of movement even remotely close to a degree associated with a formal arrest. *Id.*

Two FBI agents initiated contact with Leon with a surprise visit to his home around noon on a summer day. When Leon came to the door, the agents—dressed in plain clothes with holstered firearms—identified themselves and generally told him why they wanted to talk to him. Leon, an adult with prior experience with police questioning, willingly and voluntarily stepped out of his house and agreed to talk to them.[2]

As Leon aptly points out, the agents did not take advantage of what the Eighth Circuit has described as "[t]he most obvious and effective means of demonstrating that a suspect" is not in custody by expressly informing Leon that he was not under arrest, that answering their questions was voluntary, and that he was free to end the interview and leave at any time.[3] *Griffin*, 922 F.2d at 1349. That failure certainly weighs in Leon's favor but is not dispositive, *see Ollie*, 442 F.3d at 1137 ("No single consideration is dispositive."), particularly where, as here, the balance of the surrounding circumstances support "a contrary conclusion," *see*, *e.g.*, *United States v. Mottl*, 946 F.2d 1366, 1369-70

---

[2]The record does not say whether Leon or the agents suggested they speak outside. There is also no definitive evidence anyone else was at the house during the interview.

[3]While strongly supportive of officers giving those admonitions, the Eighth Circuit has not made them a condition of noncustodial interrogation. *See Griffin*, 922 F.2d at 1349; *United States v. Flores-Sandoval*, 474 F.3d 1142, 1147 (8th Cir. 2007) (concluding the defendant was not in custody even though he "was not informed that he was free to leave").

(8th Cir. 1991) (concluding an interview at FBI headquarters was not custodial even though the FBI agents did not inform the defendant that "he did not have to participate in the interview" and could terminate it at will and that the agents "did not intend to arrest him"). Though important, a failure to inform "is not dispositive" because "the touchstone of [the] inquiry remains whether [the defendant] was restrained as though he were under formal arrest." *United States v. Lowen*, 647 F.3d 863, 868 (8th Cir. 2011).

Here, Leon was never expressly told he was not under arrest and could refuse to talk, but there is no evidence he was not free to end the interview and leave at any time. *See Flores-Sandoval*, 474 F.3d at 1147. He was never handcuffed or otherwise physically restrained in any way during the interview. *See Ollie*, 442 F.3d at 1138 ("A suspect will generally feel more able to end an interview when his mobility is unimpeded by the authorities."); *accord United States v. Elzahabi*, 557 F.3d 879, 884 (8th Cir. 2009) (explaining even a police-station interview is noncustodial if "there is no clear indication that the defendant's freedom to depart [wa]s restricted").

The entire interview—which lasted only five to ten minutes—took place in Leon's front yard, just steps from his front door. "When a person is questioned 'on his own turf,' [the Eighth Circuit] ha[s] observed repeatedly that the surroundings are 'not indicative of the type of inherently coercive setting that normally accompanies a custodial interrogation.'" *Czichray*, 378 F.3d at 826 (internal citations omitted) (first quoting *United States v. Rorex*, 737 F.2d 753, 756 (8th Cir. 1984), then quoting *United States v. Helmel*, 769 F.2d 1306, 1320 (8th Cir. 1985)).

The tone of the interview was friendly and conversational. *See, e.g.*, *United States v. Axsom*, 289 F.3d 496, 502 (8th Cir. 2002) (finding a "friendly and cooperative" interview in the comfort and familiarity of the defendant's own home weighed against custody). Leon even willingly used Special Agent Rogers's padfolio to demonstrate what happened with the frying pan. The agents did not threaten or coerce Leon or use any strong-arm

7

tactics or deception to get him to talk.  *See*, *e.g.*, *United States v. Giboney*, 863 F.3d 1022, 1028 (8th Cir. 2017); *United States v. Vinton*, 631 F.3d 476, 481 (8th Cir. 2011).

The Court does not agree with Leon and the magistrate judge that Leon's encounter with the agents was unduly coercive or otherwise improper because the agents did not lay all their cards on the table before interviewing him.  *See Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) ("[A] noncustodial situation is not converted to one in which *Miranda* applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a 'coercive environment.'").  Leon faults Special Agent Friend for failing to share with Leon his purported objective "to shore up necessary evidence for a federal case" and for failing to "take effort to explain to Mr. Leon that, though he had already been arrested for the offense conduct[,] that he could face additional jeopardy and would be incriminating himself by engaging with an explanation to the officer."  The magistrate judge wanted the agents to tell Leon "that his answers would be used against him, that he could be further punished, that the tribal authorities did not have jurisdiction, that there was further investigation by authorities having jurisdiction, that he did not have to talk, that this was a final step before the filing of a federal charge, [and] that he was free to leave."

But neither cites any authority requiring law-enforcement officers to give such extensive disclosures before interviewing someone in these circumstances—disclosures that often mirror and, in many respects, go far beyond what *Miranda* requires even after the custody question is answered.  *See Beheler*, 463 U.S. at 1125 n.3 (noting the defendant "cite[d] no authority to support his contention that his lack of awareness [about the consequences of participating in an interview] transformed the situation into a custodial one").

What's more, "the critical inquiry is not whether the interview took place in a coercive or police dominated environment, but rather whether the defendant's 'freedom to

depart was restricted in any way.'" *LeBrun*, 363 F.3d at 720 (quoting *Mathiason*, 429 U.S. at 495). "[I]t is the objective surroundings, and not any undisclosed views, that control the *Miranda* custody inquiry." *Stansbury*, 511 U.S. at 325.

Accordingly, an interrogating officer's knowledge, beliefs, suspicions, purpose, and plans are "not relevant for purposes of *Miranda*" unless that information (1) is somehow conveyed to the person being questioned and (2) would affect "how a reasonable person in that position would perceive his or her freedom to leave." *Id.* at 325-26. Here, it was not, so it could not. Whatever benefit might have been obtained by giving Leon the proposed information, that information "does not bear upon the question whether [Leon was] in custody for purposes of *Miranda*" precisely because it was not disclosed.[4] *Id.* at 324.

Even if failing to make such broad disclosures could be deceptive or coercive on "the facts and circumstances of [a] particular case," that failure still only becomes relevant to the custody inquiry if it would affect a reasonable person's view of their freedom to leave. *Id.* at 325; *accord Laurita*, 821 F.3d at 1026 ("The use of deception is irrelevant unless it relates to a reasonable person's perception of his freedom to depart."). Nothing in the record in this case suggests the type of deception or coercion that a reasonable person would perceive as restricting their freedom to end the interview and walk away. *See*, *e.g.*, *Lowen*, 647 F.3d at 868. The Eighth Circuit has routinely found circumstances far more coercive and police dominated than these to either have little to no bearing on the custody question, *Laurita*, 821 F.3d at 1026 (listing cases), or to be noncustodial, *Giboney*, 863 F.3d at 1028-29 (same).

The Court also rejects any notion that the government's filing of "a federal charging document and issuance of summons" almost a month after the agents completed the

---

[4]"Of course, instances may arise in which the officer's undisclosed views are relevant in testing the credibility of his or her account of what happened during an interrogation." *Stansbury*, 511 U.S. at 325. Differences between an officer's written reports and oral testimony and their decisions related to accurately preserving and documenting an interview can also affect an officer's credibility.

interview is tantamount to the agents placing Leon under arrest at the end of the interview. Again, "[t]he key is the reasonable person's view [of the degree of restraint] 'during the interview.'" *United States v. Black Bear*, 422 F.3d 658, 662 (8th Cir. 2005) (quoting *United States v. Wallace*, 323 F.3d 1109, 1113 (8th Cir. 2003) (noting the defendant was arrested long after the interview, not when it ended)).

When the agents finished interviewing Leon, they did not arrest him. They thanked him and left. Leon went back into his house. He was not charged for almost a month and was never formally arrested by federal authorities. Events that occur days or weeks after an interview "do not affect the objective circumstances of [the] . . . interview, and thus cannot affect the *Miranda* custody inquiry." *Stansbury*, 511 U.S. at 324. This factor does not suggest Leon was in custody. *See United States v. Galceran*, 301 F.3d 927, 931 (8th Cir. 2002) ("Lack of arrest is a 'very important' factor weighing against custody.").

Given the totality of these circumstances, Leon was not in custody during the July 24, 2019, interview, and *Miranda* warnings were not required.

   **C.** **No Taint**

The magistrate judge found that even if Leon was not in custody during the July 24, 2019, interview, his statements from that interview should still be suppressed "as tainted by the prior *Miranda* violation in August of 2018." In reaching that conclusion, the magistrate judge analyzed the attenuation factors from *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975), in which the Supreme Court decided that a confession from a person arrested and detained in violation of the Fourth Amendment should be excluded as fruit of an illegal arrest unless the government can show a break in "the causal connection between the illegality and the confession" such that the confession is not only voluntary under the Fifth Amendment but is also "sufficiently an act of free will to purge the primary taint" for Fourth Amendment purposes. 422 U.S. 590, 602-04 (1975) (quoting *Wong Sun v. United States*, 371 U.S. 471, 486 (1963)).

10

In *Brown*, the Supreme Court identified several factors to consider "in determining whether the confession is obtained by exploitation of an illegal arrest," including "[t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct." *Id.* at 603-04. Temporal proximity "favors attenuation" if "'substantial time' elapses between an unlawful act and when the evidence is obtained." *Utah v. Strieff*, 579 U.S. ___, ___, 136 S. Ct. 2056, 2062 (2016).

Briefly applying those factors, the magistrate judge concluded "the attenuation of the taint in" this case was insufficient "to permit use of the challenged evidence." The magistrate judge acknowledged the passage of almost a year between the interviews but found "no intervening circumstances between the two interviews"—despite Leon's release from jail, return home, and significant changes in not only the setting of the interview but also the investigating agency and officers, none of which were involved in the *Miranda* violation. Focusing on the second interview rather than the circumstances of the *Miranda* violation, the magistrate judge found Special Agent Friend's purpose "was clearly to obtain admissible statements in lieu of the statements previously obtained from [Leon] while in jail without the benefit of *Miranda* warnings."

The magistrate judge then examined "whether the circumstances of this case presented a two-part interrogation practice analogous to *Missouri v. Seibert*, 542 U.S. 600 (2004)." The magistrate judge concluded *Seibert* was inapposite because the agents did not give Leon *Miranda* warnings before the second interview but nonetheless found "the scenario presented in this case is perhaps even more egregious as Agent Friend chose to obtain [Leon's] admissions a second time without any warnings at all." The magistrate judge concluded, "It is nonsensical to allow the admission of [Leon's] statements in this case when clearly established precedent forbids two-step questioning even where *Miranda* warnings are subsequently given." Based on that analysis, the magistrate judge recommends suppressing the statements Leon made on July 24, 2019.

11

The government objects to "[t]he magistrate judge's use of Fourth Amendment attenuation law to examine whether the initial Fifth Amendment violation tainted the second interview." According to the government, neither the broad Fourth Amendment exclusionary rule from *Brown* nor the two-part interrogation rules from *Seibert* apply in this case. The government contends *Oregon v. Elstad*, 470 U.S. 298 (1985), and its progeny control in this case and favor admitting Leon's July 24, 2019, statements. The government's objections are generally well taken.

The Supreme Court has long held that obtaining a confession "under circumstances which preclude" its use at trial does not automatically bar the use of a second confession obtained "after those conditions have been removed." *United States v. Bayer*, 331 U.S. 532, 541 (1947). Although an inadmissible confession may "let the cat out of the bag" and forever burden the confessor with "the psychological and practical disadvantages of having confessed," it does not "perpetually disable" them from making an admissible confession when the circumstances change. *Id.* at 540-41; *accord Elstad*, 470 U.S. at 307 (explaining the *Miranda* rule "does not require that [unwarned] statements and their fruits be discarded as inherently tainted"). Even in extreme cases where the police have "forced a full confession from the accused through unconscionable methods of interrogation, the Court has assumed that the coercive effect of the confession could, with time, be dissipated." *Elstad*, 470 U.S. at 311-12 (citing *Lyons v. Oklahoma*, 322 U.S. 596 (1944)).

The Court's analysis of the admissibility of a second confession obtained after an alleged *Miranda* violation depends on the underlying circumstances. If a defendant alleges the "police intentionally used [a] two-step interrogation technique" as "part of a deliberate attempt to circumvent *Miranda*," the analysis is governed by Justice Kennedy's concurrence in *Seibert*. *Ollie*, 442 F.3d at 1142-43. For *Seibert* to apply, "the police officer's technique [must be] a 'designed,' 'deliberate,' 'intentional,' or 'calculated' circumvention of *Miranda*." *Black Bear*, 422 F.3d at 664 (citing *Seibert*, 542 U.S. at 619-22) (Kennedy, J., concurring in the judgment); *accord United States v. Hernandez-*

12

*Hernandez*, 384 F.3d 562, 566 (8th Cir. 2004) (applying *Elstad* instead of *Seibert* in the absence of an intentional withholding of *Miranda* warnings as part of a nefarious plot).

Leon broadly condemns "the current FBI tactics used in Indian Country," which he believes "are designed exclusively to keep suspects away from exercising their constitutional rights." But the record in this case is devoid of any evidence Deputy Utemark and the agents "used a deliberate strategy of staged interrogations"—eleven months apart—to obtain Leon's statements in circumvention of *Miranda*. *Elzahabi*, 557 F.3d at 884. Therefore, the admissibility of Leon's statements to the agents "is governed by *Elstad*." *United States v. Torres-Lona*, 491 F.3d 750, 758 (8th Cir. 2007) (upholding determination that a *Miranda* violation was "merely an oversight," not deliberate); *see also United States v. Walker*, 518 F.3d 983, 985 (8th Cir. 2008) ("[B]ecause an improper tactic was not employed and the two questioning sessions were separated by time and location, this case is governed by *Elstad*, not *Seibert*.").

In *Elstad*, police officers detained an eighteen-year-old burglary suspect named Michael Elstad ("Elstad") in his parents' home. 470 U.S. at 300-01. Without being Mirandized, Elstad voluntarily made incriminating statements in response to police questioning. *Id.* at 301. About an hour later at the police station, the police advised Elstad of his *Miranda* rights. *Id.* He then knowingly waived those rights and gave a signed confession. *Id.*

Before trial, Elstad moved to suppress both his oral statement and his signed confession. *Id.* at 302. The trial court suppressed Elstad's unwarned statement but rejected his argument that the statement "'let the cat out of the bag' and tainted the subsequent confession as 'fruit of the poisonous tree.'" *Id.* (citing *Bayer*, 331 U.S. 532, and *Wong Sun*, 371 U.S. 471). Convicted and sentenced to five years, Elstad appealed. *Id.* The Oregon Court of Appeals reversed his conviction, and the Oregon Supreme Court denied the state's request for further review. *Id.* at 302-03.

The United States Supreme Court granted certiorari and reversed, holding "that a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings." *Id.* at 318. In reaching that holding, the Supreme Court explicitly refused to apply the Fourth Amendment's broad exclusionary rule as applied in *Wong Sun* and *Brown* to a procedural *Miranda* violation because the exclusionary rule "serves interests and policies [under the Fourth Amendment] that are distinct from those it serves under the Fifth." *Id.* at 305-06 (quoting *Brown*, 422 U.S. at 601)); *see also Ollie*, 442 F.3d at 1141 (noting the *Elstad* "Court rejected the argument that the fruit-of-the-poisonous-tree doctrine required suppression of the subsequent statement"). The Supreme Court explained it would be "an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that" it renders ineffective "a subsequent voluntary and informed waiver." *Elstad*, 470 U.S. at 309.

Absent evidence of actual coercion or improper police tactics in obtaining an unwarned statement, "the admissibility of any subsequent statement" turns "solely on whether it is knowingly and voluntarily made."[5] *Elstad*, 470 U.S. at 309, 318 ("[T]here is no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of *Miranda*, was voluntary."). If it is, it's admissible. *See Miranda*, 384 U.S. at 478 ("Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence.").

---

[5]That is not to say the defendant must know "his initial statement could not be used against him," *Ollie*, 442 F.3d at 1141, or that police officers must "pinch-hit for counsel" and give legal advice on issues of custody and admissibility, *Elstad*, 470 U.S. at 316 ("This Court has never embraced the theory that a defendant's ignorance of the full consequences of his decisions vitiates their voluntariness.").

14

To determine whether a subsequent statement is voluntary, the Court must examine "the surrounding circumstances and the entire course of police conduct with respect to the suspect." *Id.* at 318. If the first "statement is actually coerced," the Court must also decide "whether that coercion has carried over into the second confession" by examining factors such as "the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators." *Id.* at 310.

This case does not fall squarely within *Elstad* because, unlike Elstad, Leon was not in custody for the second interview and thus was not Mirandized between his first and second statements. Although neither the Supreme Court nor the Eighth Circuit appear to have decided the admissibility of a noncustodial statement taken after a technical *Miranda* violation, the Court is not without guidance.

Three other circuit courts have held, in analogous circumstances, that under *Elstad*, the admissibility of a second inculpatory statement obtained after a *Miranda* violation but in circumstances that did not require *Miranda* warnings "turns on whether the inculpatory statement was knowingly and voluntarily made." *United States v. Pettigrew*, 468 F.3d 626, 633-36 (10th Cir. 2006) (joining the Seventh and Ninth Circuits in concluding voluntary "statements made without *Miranda* warnings but not in response to police interrogation are admissible even though they followed an earlier voluntary statement made in violation of *Miranda*"); *see also United States v. Abdulla*, 294 F.3d 830, 835, 837 (7th Cir. 2002); *Medeiros v. Shimoda*, 889 F.2d 819, 823 (9th Cir. 1989) ("[B]ecause *Miranda* warnings were not necessary, the key issue surrounding the admissibility of the second statement is whether [the defendant] made it voluntarily."). This Court will follow their lead.

Here, Leon has not alleged his statements on August 18, 2018, were actually coerced.[6] And the Court readily concludes his statements on July 24, 2019, were voluntary

---

[6]Even if he had, the Court would find any taint had dissipated long before the second interview. After making the unwarned statements, Leon was released from jail and returned home. Ten months passed between the *Miranda* violation that made his first

15

for many of the same reasons it found Leon was not in custody. "A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." *LeBrun*, 363 F.3d at 724 (quoting *Simmons v. Bowersox*, 235 F.3d 1124, 1132 (8th Cir. 2001)). Like custody, voluntariness depends on "the totality of the circumstances." *Id.* The Court considers both "the 'conduct of the officers and the characteristics of the accused.'" *Id.* (quoting *Wilson v. Lawrence County*, 260 F.3d 946, 952 (8th Cir. 2001)). "[O]ne of the key concerns in judging whether confessions were involuntary, or the product of coercion, [is] the intelligence, mental state, or any other factors possessed by the defendant that might make him particularly suggestible, and susceptible to having his will overborne." *Id.* at 726 (alteration in original) (quoting *Wilson*, 260 F.3d at 952).

As discussed above, Leon, an adult with prior experience with the police and no particular vulnerabilities, voluntarily agreed to speak with the agents outside his home long after the technical violation of his *Miranda* rights. *See, e.g., Hernandez-Hernandez*, 384 F.3d at 565 ("The fact the statement was given five days after the initial illegal detention gave [the defendant] plenty of time to contemplate his situation and reconsider his decision to confess."). He was not restrained or threatened in any way. *See LeBrun*, 363 F.3d at 724. Within minutes, he admitted striking R.S. with a frying pan and reenacted the incident. *Id.* The agents were aware of his unwarned statements but did not try to exploit them during the second interview or make Leon any promises about his case to overbear his will. *Id.* at 725-26.

Having evaluated "the surrounding circumstances and the entire course of police conduct" in this case, *Elstad*, 470 U.S. at 318, the Court concludes Leon's statements on

---

statements inadmissible and the second interview, which took place in his front yard. Different officers from a different agency conducted the second interview and did not treat the interview as a continuation of the unwarned custodial interrogation. Any taint from Leon's first interview was gone before the second. *See Hernandez-Hernandez*, 384 F.3d at 566-67 (concluding a second statement in analogous circumstances was admissible based on "the lapse in time, change in location, and change in the interrogating personnel" from the first statement).

July 24, 2019, were voluntary and should be admitted. *Cf. United States v. Briones*, 390 F.3d 610, 614 n.3 (8th Cir. 2004) (finding subsequent statements admissible where the defendant's statements lacked significant continuity, "were separated by more than a day, occurred in different settings, and were made to different law enforcement officers representing different agencies"). Leon's motion to suppress those statements is denied.

### III. CONCLUSION

Based on the totality of the circumstances in this case, Leon was not in custody when the agents interviewed him on July 24, 2019, and the statements he made were voluntary. Although any statements he made on August 18, 2018, must be excluded under *Miranda*, his later statements are admissible. Accordingly,

IT IS ORDERED:
1. The government's objections (Filing No. 35) to the magistrate judge's findings and recommendation that defendant Omero Leon was in custody when interviewed on July 24, 2019, and that the statements he made that day were incurably tainted by the *Miranda* violation on August 18, 2018, are sustained.
2. The Findings and Recommendation (Filing No. 31) are accepted in part and rejected in part as set forth in this Memorandum and Order.
3. Leon's Motion to Suppress Statements (Filing No. 13) is granted in part and denied in part. The government may not admit as evidence at trial any custodial statement Leon made on August 18, 2018, but may admit the statements he made on July 24, 2019.

Dated this 30th day of April 2020.

BY THE COURT:

Robert F. Rossiter, Jr.
United States District Judge